Slip Op. 19-110

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| GOODLUCK INDIA LIMITED,<br><br>             Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>             Defendant,<br><br>    and<br><br>ARCELORMITTAL TUBULAR<br>PRODUCTS, MICHIGAN SEAMLESS<br>TUBE, LLC, PLYMOUTH TUBE CO. USA,<br>PTC ALLIANCE CORP., WEBCO<br>INDUSTRIES, INC. AND ZEKELMAN<br>INDUSTRIES, INC,<br><br>             Defendant-Intervenors. | Before: Gary S. Katzmann, Judge<br>Court No. 18-00162 |

## <u>OPINION</u>

[Plaintiff's motion for judgment on the agency record is granted.  The court remands to Commerce for further proceedings consistent with this opinion.]

Dated: August 13, 2019

<u>Ned H. Marshak</u> and <u>Michael S. Holton</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of New York, NY and Washington, DC, argued for plaintiff.  With them on the brief were <u>Andrew T. Schutz</u>, <u>Kavita Mohan</u>, and <u>Jordan C. Kahn</u>.

<u>Ann C. Motto</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director. Of counsel was <u>Caroline D. Bisk</u>, Office of the Chief Counsel for Trade Enforcement & Compliance, Office of the General Counsel, U.S. Department of Commerce, of Washington, DC.

<u>Melissa M. Brewer</u> and <u>Kathleen M. Cusack</u>, Kelley Drye & Warren, LLP, of Washington, DC, argued for defendant-intervenors. With them on the brief were <u>R. Alan Luberda</u> and <u>David C. Smith</u>.

Katzmann, Judge: This case turns on distinguishing correctible importer mistakes from submissions of untimely new factual information. Before the court is whether the Department of Commerce ("Commerce") abused its discretion by rejecting as untimely plaintiff Goodluck India Limited's ("Goodluck") corrections to information submitted as part of a less than fair value investigation on carbon and alloy steel from India and by subsequently relying on other sources of information to complete the factual record.

As part of the investigation, Goodluck submitted sales data on cold-drawn mechanical tubing sold in both its home market of India and in the United States and applied particular product characteristic codes to the underlying data. After Goodluck had begun preparing its data, Commerce revised its product characteristic coding guidance and extended Goodluck's submission deadline. When Goodluck submitted its responses to Commerce, it had failed to revise the coding for 682 home market sales, resulting in cascading errors in Goodluck's home sales and cost databases. Goodluck alerted Commerce to its errors -- which it characterized as correctible minor errors -- on the first day of verification, but Commerce rejected Goodluck's updated submissions as untimely new factual information. Consequently, Commerce rejected all of Goodluck's submitted data and issued Goodluck a final dumping margin of 33.80 percent based on total adverse facts available. Commerce also used another respondent's export subsidy rate to calculate Goodluck's export subsidy cash deposit offset, rather than the rate specifically calculated for Goodluck in the companion countervailing duty investigation. Goodluck appeals Commerce's determination on each issue to this court.

The court concludes that Commerce's decision to reject Goodluck's corrections was an abuse of discretion and remands to Commerce to consider Goodluck's corrected submission as well as to explain why it has departed from its general practice for calculating cash deposit offset rates in this case.

## BACKGROUND

### I.  Legal Background

Dumping occurs when a foreign company sells a product in the United States for less than fair value.  Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012). Similarly, a foreign country may artificially lower a product's price through subsidies.  U.S. Steel Grp. v. United States, 96 F.3d 1352, 1355 n.1 (Fed. Cir. 1996).  To ameliorate distortions caused by these economic practices, Congress enacted the Tariff Act of 1930 ("Act"), which empowers Commerce to investigate potential dumping or subsidies, and if appropriate, issue orders imposing duties on the subject merchandise.  Sioux Honey Ass'n, 672 F.3d at 1046–47.  These antidumping and countervailing duty actions are intended to be remedial, not punitive in nature, Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103 (Fed. Cir. 1990), and it is Commerce's duty to determine margins as accurately as possible, Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

### A.  Minor Corrections

"Although Commerce has authority to place documents in the administrative record that it deems relevant, the burden of creating an adequate record lies with interested parties and not with Commerce."  Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1337 (Fed. Cir. 2016) (quoting QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).  Commerce's

regulations address submissions of new factual information[1] by parties to an investigation, with

the type of factual information determining the time limit for submission to Commerce under 19

C.F.R. § 351.301(c).  Pertinent here, 19 C.F.R. § 351.301(c)(5) requires that miscellaneous new

factual information must be submitted either 30 days before the scheduled date of the preliminary

results, or 14 days before verification, whichever is earlier.[2]

---

[1] 19 C.F.R. § 351.102(b)(21) provides that:

"Factual information" means:

> **(i)** Evidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

> **(ii)** Evidence, including statements of fact, documents, and data submitted either in support of allegations, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

> **(iii)** Publicly available information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2), or, to rebut, clarify, or correct such publicly available information submitted by any other interested party;

> **(iv)** Evidence, including statements of fact, documents and data placed on the record by the Department, or, evidence submitted by any interested party to rebut, clarify or correct such evidence placed on the record by the Department; and

> **(v)** Evidence, including statements of fact, documents, and data, other than factual information described in paragraphs (b)(21)(i)-(iv) of this section, in addition to evidence submitted by any other interested party to rebut, clarify, or correct such evidence.

[2] 19 C.F.R. § 351.301(c)(5) provides that:

Factual information not directly responsive to or relating to paragraphs (c)(1)-(4) of this section: Paragraph (c)(5) applies to factual information other than that described in § 351.102(b)(21)(i)-(iv). The Secretary will reject information filed under paragraph (c)(5) that satisfies the definition of information described in § 351.102(b)(21)(i)-(iv) and that was not filed within the deadlines specified above. All submissions of factual information under this subsection are required to clearly explain why the information contained therein does not meet the definition of factual information described in § 351.102(b)(21)(i)-(iv), and must provide a

Apart from new factual information, "Commerce is free to correct any type of importer error—clerical, methodology, substantive, or one in judgment—in the context of making an antidumping duty determination, provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections." Timken U.S. Corp. v. United States, 434 F.3d 1345, 1353 (2006). 19 C.F.R. § 351.224(f) provides a definition of "ministerial error."[3]   Additionally, this court has held that Commerce abuses its discretion by rejecting "corrective information," which includes submissions "to correct information already provided [to Commerce]," Fischer S.A. Comercio v. United States, 34 CIT 334, 348, 700 F. Supp. 2d 1364, 1376 (2010), or to "clarif[y] information already in the record," id. at 1373, but not to "fill [ ] gap[s] caused by [a respondent's] failure to provide a questionnaire response or evidence requested during verification," id. at 1377.   Notably, no regulation addresses the circumstances under which corrections will be accepted or a time frame within which corrections should be submitted.  Deacero S.A.P.I de C.V. v. United States, 42 CIT __, __, 353 F. Supp. 3d 1303, 1307 (2018); see also Timken, 434 F.3d at 1353 (noting that it "appears that Commerce has not issued any regulation addressing whether an importer can correct errors in the information it has submitted, [nor] restricted the types of importer errors that are eligible for such correction.").

---

detailed narrative of exactly what information is contained in the submission and why it should be considered. The deadline for filing such information will be 30 days before the scheduled date of the preliminary determination in an investigation, or 14 days before verification, whichever is earlier, and 30 days before the scheduled date of the preliminary results in an administrative review, or 14 days before verification, whichever is earlier.

[3] 19 C.F.R. § 351.224(f) provides that "under this section, ministerial error means an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial."

While Commerce is afforded discretion in deciding whether to accept a respondent's corrective information, Deacero, 353 F. Supp. 3d at 1309, if "Commerce acted differently in this case than it has consistently acted in similar circumstances without reasonable explanation, then Commerce's actions will have been arbitrary," Consolidated Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003) (citing RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002)).  Moreover, "Commerce abuse[s] its discretion [when it] refus[es] to accept updated data when there [i]s plenty of time for Commerce to verify or consider it."  Papierfabrik August Koehler SE v. United States, 843 F.3d 1373, 1384 (Fed. Cir. 2016) (citing NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208–09 (Fed. Cir. 1995) (requiring correction of typing errors) and Timken, 434 F.3d at 1353 (expanding the holding in NTN to "any type of importer error—clerical, methodology, substantive, or one in judgment—... provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections")).  While "a tension may arise between finality and correct result" at later stages of an investigation, "[p]reliminary determinations are 'preliminary' precisely because they are subject to change . . . the tension between finality and correctness [does] not exist at th[at] time."  NTN, 74 F.3d at 1208.

## B. Reliance on facts otherwise available and adverse facts available

If a party fails to satisfactorily respond to Commerce's requests for "necessary information" to calculate a dumping margin by withholding requested information, failing to provide information by the submission deadlines or in the form or manner requested, significantly impeding a proceeding, or providing information that cannot be verified, Commerce shall use facts otherwise available to calculate the margin.  19 U.S.C. § 1677e(a)(2).  "The use of facts otherwise available . . . is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record."  Zhejiang Dunan Hetian Metal Co. v. United States,

652 F.3d 1333, 1346 (Fed. Cir. 2011) (citing Nippon Steel Corp. v. United States, 337 F.3d 1373,

1381 (Fed. Cir. 2003)).

Under 19 U.S.C. § 1677e(b)(1)(A), Commerce may apply adverse inferences as facts

available ("AFA") when Commerce "finds that an interested party has failed to cooperate by not

acting to the best of its ability to comply with a request for information[.]"  A respondent does not

cooperate to the "best of its ability" when it fails to "put forth its maximum effort to provide

Commerce with full and complete answers to all inquiries."  Dillinger France S.A. v. United States,

42 CIT __, __, 350 F. Supp. 3d 1349, 1360 (2018) (quoting Nippon Steel, 337 F.3d at 1382).

"[W]here there is useable information of record but the record is incomplete," Commerce applies

partial AFA.  Wash. Int'l Ins. Co. v. United States, 33 CIT 1023, 1035 n.18 (2009) (citing Yantai

Timken Co., Ltd. v. United States, 31 CIT 1741, 1746–48, 521 F. Supp. 2d 1356, 1364–65 (2007),

aff'd 300 Fed. Appx. 934 (Fed. Cir. 2008)).  In contrast, when "none of the reported data is reliable

or usable," Mukand, Ltd. v. United States, 767 F.3d 1300, 1305, 1307–08 (Fed. Cir. 2014), that is,

when it "exhibit[s] pervasive and persistent deficiencies that cut across all aspects of the data,"

Zhejiang, 652 F.3d at 1348, Commerce applies total AFA.

## C.  Export subsidy cash deposit offset determinations

"If Commerce issues a final determination that subject merchandise is being, or is likely to

be sold in the United States at less than fair value, Commerce orders the posting of a cash deposit

for each entry of the subject merchandise based on the estimated weighted average dumping

margin."  Jinko Solar Co. v. United States, 41 CIT __, 229 F. Supp. 3d 1333, 1359 (2017) (citing

19 U.S.C. §§ 1673d(a)(1), 1673d(c)(1)(B)(i)–(ii)).  "The price used to establish export price and

constructed export price shall be increased by the amount of any countervailing duty imposed on

the subject merchandise . . . to offset an export subsidy."  19 U.S.C. § 1677a(c)(1)(C).  "Neither

the statute nor Commerce's regulations otherwise define how the cash deposit is to be calculated

in an investigation," and so "Commerce has discretion to establish a reasonable practice to

calculate a cash deposit rate in investigations where there is no clear statutory directive." Jinko,

229 F. Supp. 3d at 1358 (citing United States v. Eurodif S.A., 555 U.S. 305, 316 (2009)).

## II. Factual Background and Procedural History

On May 16, 2017, Commerce initiated less than fair value investigations on carbon and

alloy steel from India, see Initiation of Less-Than-Fair-Value Investigations, 82 Fed. Reg. 22,491

(May 16, 2017), Public Record ("P.R.") 32, following a petition submitted on April 19, 2017 by

ArcelorMittal Tubular Products, Michigan Seamless Tube, LLC, PTC Alliance Corp., Webco

Industries, Inc., and Zekelman Industries, Inc. Id.

On June 19, 2017, Commerce designated Goodluck as a mandatory respondent.[4] See U.S.

Department of Commerce Questionnaire to Goodluck (June 19, 2017) ("ADD Questionnaire"),

P.R. 81. Commerce solicited data from Goodluck via questionnaire on every sale of subject

merchandise Goodluck made in its home market of India ("Section B"), to the United States

("Section C"), and product specific costs ("Section D") during the period of investigation from

---

[4] In antidumping duty investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(c)(2), which provides:

If it is not practicable to make individual weighted average dumping margin determinations [in investigations or administrative reviews] because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to—

(A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or

(B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

April 1, 2016 to March 31, 2017.  Id.  Field 2.0 of the questionnaire instructed Goodluck to create

and report a control number, or "CONNUM," for "'each unique product' reported in the sales and

cost data files," using product characteristic-specific codes provided by Commerce.[5]  Id. at 109,

136.

When Commerce first provided the questionnaire to Goodluck on June 19, 2017,

Commerce had not yet determined how certain physical characteristics should be coded for the

purposes of constructing the 24-digit CONNUMs.  See U.S. Department of Commerce CONNUM

Letter (July 6, 2017), P.R. 95 ("First CONNUM Letter").  On July 6, 2017, Commerce issued to

Goodluck the product characteristic codes via letter.  Id.  At that time, Goodluck's Section B, C,

and D responses were due to Commerce on August 7, 2017.  Id.

Field 2.5 required Goodluck to provide nominal wall thickness in millimeters for each tube

Goodluck sold in both its home market of India in its Section B questionnaire response and in the

United States in Section C.  Id. at Attach. 1.  Field 3.5 required Goodluck to apply a two-digit code

to the numeric wall thickness reported in Field 2.5 according to thickness ranges provided by

Commerce in its July 6, 2017 letter.  Id.  The two-digit codes reported in Field 3.5 were then

combined with codes for additional physical characteristics contained in other fields to create the

24-digit CONNUMs reported in Field 2.0.  See ADD Questionnaire at 109, 136.  Goodluck

reported weighted average CONNUM-specific costs and used CONNUM-specific expenses to

create the Section D database.  Id. at 162.

---

[5] Commerce instructed that "identical products should be assigned the same control number in each record in every file in which the product is referenced (e.g., products with identical physical characteristics reported in the foreign market sales file and the U.S. market sales file should have the same control number."  ADD Questionnaire at 109, 136.

On July 12, 2017, Petitioners submitted comments to Commerce contesting the correspondence of certain product characteristics to the Commerce-devised codes. See Petitioners' CONNUM Comments (July 12, 2017), P.R. 97. Specifically, Petitioners asserted that Commerce's wall thickness ranges "were too broad to accurately capture cost and price differences between products" and would undermine cost of production and product matching. Id. at 4–5. Following Petitioners' comments, Commerce sent Goodluck a Revised Product Characteristics Letter on August 7, 2017. See U.S. Department of Commerce Revised Product Characteristics Letter (Aug. 7, 2017), P.R. 153 ("Revised CONNUM Letter"). This letter modified and increased the number of coding ranges for Goodluck to apply to the nominal wall thickness in Field 2.5 to create the two-digit code reported in Field 3.5. See id. at Attach. 1; see also First CONNUM Letter at Attach. 1. On August 25, 2017, Goodluck timely submitted its questionnaire responses for Sections B, C, and D to Commerce, see Goodluck Sections BC&D Questionnaire Response (Aug. 25, 2017), P.R. 165–68, C.R. 62–131, reporting costs for 385 CONNUMs of subject merchandise, see, e.g., id. at 788–95.

On September 20, 2017 and October 2, 2017, Commerce asked Goodluck for additional supplemental information on Section D and Sections B and C, respectively. See U.S. Department of Commerce Section D Supplemental Questionnaire to Goodluck (Sept. 20, 2017), P.R. 190, C.R. 168; see also U.S. Department of Commerce Section B-C Supplemental Questionnaire to Goodluck (Oct. 2, 2017), P.R. 196, C.R. 170. Goodluck submitted its responses to the Section B and C supplemental questionnaires on October 20 and 23, 2017. See Goodluck Supplemental Section B-C Questionnaire Responses (Oct. 20, 2017), P.R. 220, C.R. 207–11; see also Goodluck Supplemental Section B-C Questionnaire Responses (Additional Question) (Oct. 23, 2017), P.R. 222, C.R. 220–21. In these exchanges, neither Commerce nor Goodluck raised the manner in

which Goodluck had reported nominal wall thickness in Field 2.5 or coded the wall thickness in Field 3.5.

On November 22, 2017, Commerce issued its preliminary determination finding that Goodluck's dumping margin was de minimis.  See Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, in Part, Postponement of Final Determination, and Extension of Provisional Measures, 82 Fed. Reg. 55,567 (Nov. 22, 2017), P.R. 240.   On November 20, 2017, Petitioners filed a ministerial error allegation requesting Commerce to correct a clerical error in the coding of two steel products sold in the home market.  See Petitioners Ministerial Error Allegation (Nov. 20, 2017), P.R. 238, C.R. 238.  On November 27, 2017, Goodluck filed a ministerial error letter asking Commerce to correct this mistake.  See Goodluck Ministerial Error Letter (Nov. 27, 2017), P.R. 249, C.R. 242.  Commerce agreed to do so on January 3, 2018, and revised Goodluck's preliminary dumping margin to 4.2 percent.  See U.S. Department of Commerce Amended Preliminary Margin Calculation Memo (Jan. 3, 2018), P.R. 276, C.R. 380–84.

On November 22 and 27, 2017, Commerce sent its Sales Verification Agenda-Outline and Cost Verification Agenda-Outline, respectively, to Goodluck, instructing:

> [V]erification is not intended to be an opportunity for submission of new factual information.  New information will be accepted at verification only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information on the record.

See U.S. Department of Commerce Sales Verification Agenda-Outline for Goodluck (Nov. 22, 2017), P.R. 244, C.R. 240; see also U.S. Department of Commerce Cost Verification Agenda-Outline for Goodluck (Nov. 27, 2017), P.R. 246, C.R. 241.

While preparing for verification, Goodluck discovered that it had reported incorrect codes in Field 3.5 for 682 observations in its home market sales database provided in its Section B questionnaire. See Goodluck Sales Verification Exhibits (Dec. 12, 2017), P.R. 269, C.R. 290–93. The incorrect codes in Field 3.5 reflected Commerce's coding instructions provided in the original July 6, 2017 letter, rather than the updated coding guidance contained in Commerce's August 7, 2017 letter. Id. at Exhibit 16.

On the first morning of Sales Verification on December 4, 2017, Goodluck informed Commerce of its error and provided Commerce with a worksheet identifying the erroneous data entries for Field 3.5, which presented the incorrectly reported two-digit product characteristic codes side-by-side with the corrected codes. See Pl.'s Br. at Attach. One; see also Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From India: Final Affirmative Determination of Sales at Less than Fair Value ("Final Determination"), 83 Fed. Reg. 16,296 (Apr. 16, 2018), P.R. 317, accompanying Issues and Decision Memorandum at 6–8 (Apr. 9, 2018) ("IDM"), P.R. 311. On the first morning of Cost Verification on December 11, 2017, Goodluck again directed Commerce to the errors. IDM at 6–8. Commerce's Cost Verification Report noted "[c]orrection of these errors would result in changes to the physical characteristics of 24 CONNUMs and the addition of 13 new CONNUMs" that were not included in Goodluck's original Section D cost database submission. See U.S. Department of Commerce Cost Verification Report (Jan. 18, 2018), P.R. 278, C.R. 385.

On February 15, 2018, both Goodluck and Petitioners filed Case Briefs with Commerce. See Goodluck Case Brief (Feb. 15, 2018), P.R. 288, C.R. 389; see also Petitioners' Case Brief (Feb. 15, 2018), P.R. 291, C.R. 392. Commerce rejected Goodluck's case brief on February 20, 2018 for including untimely new factual information on Goodluck's identified questionnaire

errors.  See U.S. Department of Commerce Letter re: Rejection of New Factual Information (Feb. 20, 2018), P.R. 295.  Goodluck refiled a redacted case brief on February 21, 2018.  See Goodluck Redacted Case Brief (Feb. 21, 2018), P.R. 296, C.R. 406.  Commerce rejected Goodluck's redacted case brief on March 7, 2018, see U.S. Department of Commerce Letter re: Rejection of New Factual Information (Mar. 7, 2018), P.R. 302, and Goodluck's corrected database on March 19, 2018 for containing untimely new factual information, see Letter from U.S. Department of Commerce re: Rejection of New Factual Information (Mar. 19, 2018), P.R. 306.

On April 16, 2018, Commerce issued its final determination announcing a dumping margin for Goodluck of 33.80 percent and a cash deposit rate of 33.70 percent.  See Final Determination, 83 Fed. Reg. 16,296.  In reaching the Final Determination, Commerce rejected all of the data submitted by Goodluck in its questionnaires and instead relied on total AFA to calculate Goodluck's dumping margin.  IDM at 10–14.

In determining Goodluck's cash deposit rate of 33.70 percent, Commerce employed the .10 percent export subsidy rate calculated for Tube Products of India, Ltd. ("TPI"), a separate respondent in the investigation.  See Goodluck Final Determination Ministerial Error Comments (Apr. 17, 2018), P.R. 316.  On April 17, 2018, Goodluck timely filed ministerial error comments to challenge Commerce's use of TPI's export subsidy rate instead of 4.85 percent, the rate calculated specifically for Goodluck in the accompanying countervailing duty investigation.  Id. Commerce rejected Goodluck's claim via memorandum on May 16, 2018.  See U.S. Department of Commerce Ministerial Error Allegation Memorandum (May 16, 2018), P.R. 318.

On July 10, 2018, Goodluck filed its complaint with this court appealing from Commerce's Final Determination.  Compl., ECF No. 4.  Goodluck filed its brief on December 14, 2018.  Mot. for J. on the Agency R. ("Pl.'s Br."), ECF Nos. 21–22.  Defendant the United States ("the

Government) and Defendant-Intervenors filed their responses on April 24, 2019.  Resp. to Mot. for J. on the Agency R. ("Def.'s Br."), ECF No. 27; Resp. in Opp'n to Mot. for J. on the Agency R. ("Def.-Inters.' Br."), ECF No. 28.  Goodluck filed its reply on May 28, 2019.  Reply Br. ("Pl.'s Reply"), ECF Nos. 30–31.  The court heard oral argument on July 11, 2019.  ECF No. 43.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a.  The court may review final affirmative determinations in countervailing duty or antidumping duty proceedings under 19 U.S.C. § 1561a(a)(2)(B)(i) and will hold unlawful those agency determinations which are unsupported by substantial evidence on the record or otherwise not in accordance with law under 19 U.S.C. § 1515a(b)(1)(B)(i).

## DISCUSSION

Goodluck contends that Commerce's determination was unsupported by substantial evidence and contrary to law because (1) Commerce abused its discretion by rejecting Goodluck's correction submission at verification; (2) Commerce's reliance on adverse facts available was not warranted where there were no gaps in the record and where Goodluck did not significantly impede the investigation; and (3) Commerce deviated from its typical practice when calculating Goodluck's export subsidy cash deposit without adequate explanation.  The court concludes that Commerce's decision to reject Goodluck's corrections was an abuse of discretion and remands to Commerce to consider Goodluck's corrected submission as well as to explain why it has departed from its general practice for calculating export subsidy cash deposit offset rates in this case.  The court declines to reach Commerce's reliance on facts otherwise available and adverse inferences at this time.

I.      **Commerce's rejection of Goodluck's updated data was not supported by substantial evidence or in accordance with law.**

The Government contends that Commerce properly rejected Goodluck's corrections submitted at verification because the errors Goodluck identified amounted to untimely new factual information under 19 C.F.R. § 351.301(c)(5) and the verification instructions.[6]   Specifically, according to the Government, the errors identified were so fundamental and systematic that they compromised the integrity of the dataset as a whole.

The court finds this argument unpersuasive in light of existing case law and Commerce's own past practice.  For example, in NTN Bearing Corp. v. United States, the Federal Circuit held that Commerce abused its discretion when it refused to consider NTN's corrections of errors in its submissions because of the "untimely" submission of the corrective information.  NTN, 74 F.3d at 1208.  When converting its sales data to the manner requested by Commerce, NTN entered some improper code numbers.  Id.  "The effect of these mistakes was compounded because [Commerce] used a sampling method to determine the extent of dumping, and the sample data contained the clerical errors."  Id. at 1205.  In concluding that Commerce abused its discretion by rejecting NTN's corrections, the Federal Circuit noted that "NTN responded in a timely manner to the preliminary determination" when alerting Commerce to its errors, and that "[a] straightforward mathematical adjustment was all that was required.  Failure to make it resulted in the imposition

---

[6] Commerce's November 22, 2017 Sales and Costs Verification Agenda-Outline instructions:

> [V]erification is not intended to be an opportunity for submission of new factual information. New information will be accepted at verification only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports or clarifies information on the record.

See U.S. Department of Commerce Sales Verification Agenda-Outline for Goodluck (Nov. 22, 2017), P.R. 244, C.R. 240; see also U.S. Department of Commerce Cost Verification Agenda-Outline for Goodluck (Nov. 27, 2017), P.R. 246, C.R. 241.

of many millions of dollars in duties not justified under the statute" in light of the antidumping laws' remedial, and not punitive, purposes. Id. at 1208.

Applying NTN, this court in Fischer S.A. v. United States distinguished correctible importer error entailing "a mistaken previous submission" to the record from new factual information filling "[a] gap caused by failure to provide a questionnaire response or evidence during verification."  700 F. Supp. 2d at 1377.  In that case, Fischer reported the wrong factor -- called a "Brix level" -- for Commerce to use in its formula for converting its United States and home market sales to the same measurement system so Commerce could make an accurate comparison. Id. at 1370–72.  The Fischer court held that

> On the authority of Timken and NTN Bearing, the Court holds that Commerce abused its discretion in rejecting Fischer's additional agreement pages as untimely. Doing so was an abuse of discretion because (1) no finality concerns demanded exclusion of the additional data at the preliminary results stage; (2) failure to consider the additional pages to correct information already provided was a violation of Commerce's duty to determine Fischer's dumping margin as accurately as possible; (3) consideration of the additional data is necessary to ensure that the remedial, non-punitive nature of the antidumping laws is not violated by imposition of inaccurately high antidumping duties on Fischer despite the evidence that was rejected; and (4) the recalculation of Fischer's dumping margin could be accomplished by simply replacing the actual Brix levels reported by Fischer in its database with the standard Brix level of 11.8 degrees, should Commerce determine upon remand that the sales agreement pages in fact substantiate that Brix levels above 11.8 degrees did not increase the United States unit price of Fischer's NFC.

Id. at 1376–77.

Here, like the respondents in NTN and Fischer, Goodluck sought to rectify reporting mistakes contained in its previous submission to the record and not to fill gaps caused by an omission or withholding of requested information from Commerce.  Goodluck did not seek to provide additional underlying production data -- which was correctly reported in its Section B and C questionnaire -- but merely to remedy Goodluck's misapplication of Commerce-devised codes to the underlying data. As in NTN, Goodluck's miscoding of nominal wall thickness in Field 3.5,

which impacted two digits of a 24-digit CONNUM, could have been addressed through a "straightforward mathematical adjustment" even though the "effect of these mistakes was compounded" by how Commerce used the incorrect CONNUMs.  See NTN, 74 F.3d at 1205; Certain Hot-Rolled Steel Flat Products from the United Kingdom, 81 Fed. Reg. 53,436 (Aug. 12, 2016), accompanying Issues and Decision Memorandum at Comment 1 (noting that whether a reporting error "affected many transactions and cascaded into other fields in [a] database" is not dispositive on the error's categorization).

        The Government argues that accepting Goodluck's submission would have "involve[d] numerous corrections," including "revising the weighted average CONNUM costs," see IDM at 8, which rendered it new factual information and a systematic error.  However, whether the "effect of these mistakes was compounded" by how Commerce used the incorrect CONNUMs does not transform a minor correction into substantial new factual information.  See NTN, 74 F.3d at 1205; Certain Hot-Rolled Steel Flat Products from the United Kingdom, 81 Fed. Reg. 53,436 (Aug. 12, 2016), accompanying Issues and Decision Memorandum at Comment 1 (noting that whether a reporting error "affected many transactions and cascaded into other fields in [a] database" is not dispositive on the error's categorization).  As Commerce has previously stated -- and this court has affirmed -- "the value of the errors as a percentage of total sales, or the number of instances of errors" is not decisive.  See The Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers v. United States, 23 CIT 88, 93, 44 F. Supp. 2d 229, 236 (1999).  Commerce articulated a standard for delineating what constitutes a "substantial revision of [a] response" in Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China, 75 Fed. Reg. 59,217 (Sept. 27, 2010), accompanying Issues and Decision Memorandum at Comment 10.  In Certain Coated Paper, despite declaring

that the impact of the respondent APP-China's miscoding of a particular product characteristic[7]

"may not be minor," Commerce nevertheless accepted the correction at verification as a minor

correction because it "d[id] not involve production data, or call into question [Factors of

Production[8]] and cost reconciliations." Id. Like with APP-China, parties here are not contesting

the accuracy of Goodluck's underlying production, input,[9] or cost data. On costs specifically, in

the section entitled "Cost Reconciliations" of Commerce's Cost Verification Report, Commerce

stated: "We reconciled the total [period of investigation ("POI")] costs from the financial

statements to the total POI cost of units that produced [merchandise under consideration]." See

U.S. Department of Commerce Cost Verification Report at 8 (Jan. 18, 2018), P.R. 278, C.R. 385.

While it is true that some of the "weighted average CONNUM-specific costs" provided by

Goodluck were inaccurate, IDM at 12, this does not implicate the accuracy of Goodluck's

underlying data, but rather was a cascading result of Goodluck's coding error in field 3.5 of its

home market sales database. As with APP-China, the impact of Goodluck's coding error "may

---

[7] The correction at issue in Certain Coated Paper involved revising the "reporting of a particular 'finish' characteristic for several of APP-China's products from characteristic '2' – indicating a finish between 65 and 74.99, to characteristic '1' – indicating a finish of 75 or greater." 75 Fed. Reg. 59,217 (September 27, 2010), accompanying Issues and Decision Memorandum at Comment 10.

[8] "Factors of production are the inputs consumed to produce the subject merchandise." Nat'l Nail Corp. v. United States, Slip Op. 19-71, 2019 WL 2537931, at *3 n.11 (CIT June 12, 2019).

[9] The court notes that Commerce's IDM stated: "[P]arties commented on Goodluck's reporting of nominal field lengths, steel grade, credit, insurance, indirect selling expenses, and inventory carrying costs, U.S. destinations, date of sale, quality rejections, cost specificity, intra-company transfers, and rebates." However, Commerce did not reach these points in light of its decision to rely on total AFA. IDM at 13. It is possible that these additional contentions could undermine the accuracy of Goodluck's reported production data, factors of production, and/or cost reconciliations, and thereby render Goodluck's submission a "substantial revision" under the standard articulated in Certain Coated Paper. However, because Commerce did not fully explain the implications of this statement, the court will not speculate.

not [have] be[en] minor;" nevertheless, under the standard articulated in <u>Certain Coated Paper</u>, correction of Goodluck's errors should not require a "substantial revision of [its] response" given the accuracy of Goodluck's underlying data.

The Government further contended that accurately coded product characteristics are indispensable to less than fair value investigations, and within product characteristics, accurately coded wall thickness are paramount to cold-drawn mechanical tubing because misreporting wall thickness dramatically skews costs. <u>See</u> Oral Argument, July 11, 2019, ECF No. 43. In the Government's estimation, errors in such crucial elements of the investigation cannot be considered minor. As an initial matter, the court notes that Commerce did not specifically emphasize the importance of wall thickness in its <u>IDM</u>. Rather, Commerce more generally asserted that "[w]ithout accurate reporting of physical characteristics [generally] and matching CONNUMs in Goodluck's databases, Commerce does not have the primary components to perform an accurate, reliable margin calculation for Goodluck" and stated that such "errors in a factor as fundamental as the control number invalidate[] the allocations, matches, and calculations that follow." <u>IDM</u> at 8–9.

Notwithstanding these contentions, Commerce has previously deemed errors in product characteristic coding, wall thickness coding, and CONNUM creation to be minor errors at verification, despite the impact of the errors on "allocations, matches, and calculations that follow." In a case similar to the one at bar, <u>National Steel Corp. v. United States</u>, Commerce found errors committed by the respondent Hoogovens to be neither "systematic in nature" nor "amount[ing] to a failure to provide information" -- despite the fact that, like Goodluck, Hoogovens informed Commerce on the first day of verification that it had discovered inaccuracies affecting "product characteristics submitted to Commerce," the majority of which "involved the

miscalculating of thickness [which] placed a number of sales in the wrong thickness group." 18

CIT 1126, 1127, 870 F. Supp. 1130, 1132 (1994). As with Goodluck, Commerce found that

Hoogovens' error affected home market sales CONNUMs, and correspondingly, "a significant

percentage of margin calculations" and "the model matching hierarchy." Id. at 1133. Yet, unlike

with Goodluck, Commerce concluded that Hoogovens' "errors themselves were minor" and

Hoogoven "did not omit data, but only provided inaccurate information."[10] Id. at 1134. While

each case turns on its own facts and circumstances, treating Goodluck's strikingly similar error

differently is arbitrary.[11]

---

[10] Given the case law that governed in 1994, Commerce decided not to accept Hoogovens' corrections due to time constraints, despite finding that Hoogovens' errors were minor. National Steel, 870 F. Supp. at 1133. Such a determination by Commerce -- finding a respondent's computer conversion errors to be minor, and yet declining to correct them -- would soon be precluded by the Federal Circuit case NTN Bearing Corp. v. United States in 1995, which held that Commerce had abused its discretion in refusing to correct a respondent's typographical errors identified prior to the issuance of final results. 74 F.3d at 1207–08. All of that aside, the salient point in this case comparison is that Commerce's reasoning is inexplicably inconsistent: Commerce declared Hoogovens' CONNUM reporting errors to be neither "systematic" nor "amount[ing] to a failure to provide information," National Steel, 870 F. Supp. at 1134, and yet found Goodluck's strikingly similar error to be "systematic," amounting to a provision of new factual information.

[11] When questioned about this difference, the Government responded in Oral Argument that because Hoogovens' mistakes resulted from a computer conversion error, it therefore qualified as a clerical error (stemming from "inaccurate copying, duplication, or the like" under 19 C.F.R. § 351.224(f)); while Goodluck's error "entailed more than copying or duplicating," but properly analyzing and following directions. Def.'s Br. at 21; Oral Argument, July 11, 2019, ECF No. 43; IDM at 8. The court is unpersuaded. To produce the erroneously coded 682 home market sales observations, Goodluck still copied and/or duplicated codes provided by Commerce, but simply the wrong ones -- as evidenced by the fact that Goodluck's errors reflected Commerce's original July 6, 2017 coding guidance instead of the revised guidance. See First CONNUM Letter at Attach. 1; see also Revised CONNUM Letter.

        Moreover, the Government acknowledged that had Goodluck simply mistyped Commerce's updated coding guidance in the process of revising the 682 home market sales observations -- with the same cascading effects on CONNUMs and weighted average CONNUM-specific costs -- such mistyping would be a correctible clerical error at the preliminary investigation phase, but maintained that verification was too late to make such corrections. However, this delineation in timing is inconsistent with NTN, which held that Commerce abused

Finally, the Government contests Commerce's assertion that "the rejected information was

available in the record" because "the code was 'derived' from the data reported in a separate field,

field 2.5," pointing out that "nowhere in its case brief does Goodluck -- or can it -- point to a place

on the record in which this new information [the corrected CONNUM codes] can be found." Def.'s

Br. at 25.  The Government argues that the 13 unreported CONNUMs stemming from Goodluck's

coding error necessarily dictate a finding of new factual information.  The court is not convinced

by this argument.  As discussed above, in <u>NTN</u>, some code numbers were incorrect,[12] and yet the

---

its discretion in declining to correct typographical coding errors identified before Commerce had issued its final results.  74 F.3d at 1209.

Additionally, the court is unconvinced by Commerce's explanation for why this error constitutes a failure to adhere to instructions.  In its <u>IDM</u> at 8, Commerce states that "Goodluck did not adhere to Commerce's coding instructions, despite having the correct information on hand."  The court notes that for any correctible error, the respondent necessarily has the correct information on hand, but inadvertently reports the wrong information instead and thus seeks to correct that mistake.  In addition, as discussed, this is not a situation where a company was unresponsive, provided fraudulent information, or clearly ignored Commerce's instructions; rather, Goodluck believed it had reported the correct information in accordance with Commerce's instructions -- and largely did so -- but made a mistake.  It is thus unclear from Commerce's explanation what renders Goodluck's error here a failure to follow instructions rather than a correctible error.

[12] The Government emphasizes the Federal Circuit's use of the word 'transposed' to suggest that Goodluck's error was distinguishable from those at issue in <u>NTN</u>.  However, as discussed in footnote 11, the Government's attempt to draw a divide between pure typographical errors and Goodluck's error is a distinction without a difference.  Moreover, Federal Circuit progeny cases establish that the holding of <u>NTN</u>is not limited to pure typographical, or even clerical, errors.  <u>Papierfabrik August Koehler SE v. United States</u> -- the most recent Federal Circuit treatment of <u>NTN Bearing</u> -- stated:

> We have held that Commerce abused its discretion in refusing to accept updated data when there was plenty of time for Commerce to verify or consider it.  <u>NTN Bearing Corp. v. United States</u>, 74 F.3d 1204, 1207–8 (Fed. Cir. 1995) (requiring correction of typing errors); <u>Timken U.S. Corp. v. United States</u>, 434 F.3d 1345, 1353 (Fed. Cir. 2006) (expanding the holding in <u>NTN</u> to "any type of importer error—clerical, methodology, substantive, or one in judgment—…provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections").

843 F.3d at 1384.

Federal Circuit found that Commerce abused its discretion by rejecting NTN's corrections. Moreover, as discussed above, cascading effects of errors -- such as the effect of CONNUMs here -- do not transform a correctible error into new factual information.

The cases provided by Defendant-Intervenor and the Government involving untimely new factual information -- as opposed to correctible importer error -- are easily distinguishable from the instant case, and in fact further illuminate how Goodluck's submission differs from impermissible new factual information.  For example, in Mukand Ltd. v. United States, the Federal Circuit found that Commerce had permissibly refused the respondent's untimely new information because Commerce had asked Mukand "for size-specific cost information on five separate occasions" and Mukand was only "suddenly willing and able to provide" the data after Commerce had preliminarily resorted to adverse facts available.  767 F.3d at 1305.  By contrast, Goodluck demonstrated no such withholding of requested information from Commerce.  Instead, Goodluck complied with Commerce's requests for the underlying data, but improperly applied product characteristic codes, with respect to one of nine physical characteristics.  Pl.'s Br. at 40.  While Mukand's submission was clearly an attempt to fill "[a] gap caused by [Mukand's] failure to provide a questionnaire response," and therefore constituted untimely new factual information, see Fischer, 700 F. Supp. 2d at 1377, Goodluck's submission was merely corrective information to rectify reporting errors in its earlier submission.[13]

---

[13]  For its part, the Government cited to Stupp Corp. v. United States, 43 CIT __, 359 F. Supp. 3d 1293, 1301 (2019) for the proposition that manipulating existing record evidence to derive corrected data necessarily constitutes new factual information.  The court disagrees with this interpretation as applied to the facts of this case.  In Stupp, the respondent, SeAH, manipulated existing record evidence to create two new databases, not for the purpose of correcting its own coding error, but rather to rebut evidence placed on the record by Commerce.  Such rebuttal evidence falls expressly within the definition of "factual information" under 19 C.F.R. § 351.102(b)(21)(iv) ("evidence submitted by any interested party to rebut . . . evidence placed on the record by the Department"), with corresponding regulatory deadlines.  By contrast

For these reasons, the court concludes that Goodluck's submission was correctible importer[14] error and not untimely new factual information.  Goodluck sought to rectify reporting mistakes contained in its previous submission to the record, and not to supply additional underlying data to fill gaps caused by an omission or withholding of requested information from Commerce. While the Government nevertheless contended that Goodluck's mistakes should be held to "reach[] the threshold for new factual information pursuant to 19 C.F.R. § 351.301(c)(5)," Commerce's proffered reasons for doing so are either unsupported by case law or would entail Commerce arbitrarily treating similar situations differently, Consolidated Bearings, 348 F.3d at 1007 (citing RHP Bearings, 288 F.3d at 1347), amounting to an abuse of discretion.  Finally, while the Government contended that verification was simply too late in the investigation process to correct Goodluck's errors, as discussed above, the Federal Circuit has found correcting analogous errors disclosed in a similar timeframe to be feasible and appropriate.  See NTN, 74 F.3d at 1208 ("Preliminary determinations are 'preliminary' precisely because they are subject to change.  Thus, the tension between finality and correctness simply did not exist at the time NTN requested correction.").  In sum,

> [D]raconian penalties are [not] appropriate for the making of clerical errors in order to insure submission of proper data.  Clerical errors are by their nature not errors in judgment but merely inadvertencies.  While the parties must exercise care in their submissions, it is unreasonable to require perfection.  [Commerce's] refusal to consider [plaintiff's] request for correction of clerical errors in this case constituted an abuse of discretion.

---

"Commerce's regulations . . . do not provide a time frame within which [importer error] corrections should be submitted."  Deacero, 353 F. Supp. at 1307.

[14] In light of the court's finding that Goodluck's errors are minor, it need not address the issue as to whether Commerce is only obligated to correct clerical errors versus methodological ones beyond the discussion found in footnote 12.

Id. at 1208–09.   The court thus remands to Commerce to consider Goodluck's corrected data submission.[15]

## II.      Commerce's did not adequately explain its export subsidy cash deposit offset determination.

Commerce used the export subsidy rate of another respondent, TPI, to calculate Goodluck's export subsidy cash deposit offset, rather than the rate specifically calculated for Goodluck in the companion CVD investigation.   Goodluck argued that doing so was contrary to Commerce's general practice of adjusting antidumping margins -- even those calculated through AFA -- by the company-specific export subsidy rate calculated in the companion CVD case, and was otherwise unreasonable.   Pl.'s Br. at 43.   The Government counters that because 19 U.S.C. § 1677a(c)(1)(C)[16] does not otherwise define how Commerce should calculate a cash deposit rate in an investigation, "Commerce has discretion to establish a reasonable practice."   Def.'s Br. at 26.

---

[15] As discussed above, Goodluck also challenged Commerce's application of facts available and adverse inferences.   Although Commerce has discretion when applying facts available and adverse inferences, "this discretion is not without limits.   The appropriate rate 'will depend upon the facts of a particular case,' cannot be 'punitive, aberrational, or uncorroborated,' includes 'some built-in increase' to deter non-compliance, and . . . reflects the seriousness of the non-cooperating party's misconduct."   BMW of N. Am. LLC v. United States, 926 F.3d 1291, 1301 (Fed. Cir. 2019) (citing Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1347 (Fed. Cir. 2016) and F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). However, because the court finds that Goodluck's submission involved minor correctible importer error, at this time, it need not address Commerce's use of facts available, as the gap alleged by Commerce may be resolved by Commerce's consideration of Goodluck's submission. Additionally, because a proper facts available determination is a prerequisite for use of adverse facts available, the court correspondingly does not reach Commerce's reliance on adverse inferences and particularly total AFA.

[16] 19 U.S.C. § 1677a(c)(1)(C) provides:

    (c) Adjustments for export price and constructed export price

        The price used to establish export price and constructed export price shall be—

            (1) increased by—

Commerce indeed has discretion to establish a reasonable practice, but it must also explain the reasons for deviating from that practice. See, e.g., Consolidated Bearings, 348 F.3d at 1007 (holding that if "Commerce acted differently in this case than it has consistently acted in similar circumstances without reasonable explanation, then Commerce's actions will have been arbitrary""). Here, Goodluck cited several determinations in which "Commerce adjusted respondents' [AFA] ADD margins . . . by the export subsidies the company received in the companion CVD case." Pl.'s Reply at 16–18. See, e.g., Carbazole Violet Pigment 23 from India: Final Results of Antidumping Duty Administrative Review; 2015-2016, 83 Fed. Reg. 15,788, 15,789 (Apr. 12, 2018); Fine Denier Polyester Staple Fiber From India: Final Affirmative Determination of Sales at Less Than Fair Value, 83 Fed. Reg. 24,737 (May 30, 2018). At Oral Argument, the Government acknowledged that Fine Denier indeed represents Commerce's most common export subsidy cash deposit offset practice, see Oral Argument, July 11, 2019, ECF No. 43, but asserted that because Goodluck was uncooperative in the companion countervailing duty investigation, the lowest possible export subsidy cash deposit offset adjustment was appropriate.[17] Def.'s Br. at 27. On the other hand, Defendant-Intervenors offer a different rationale for

---

        (C) the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy

[17] Goodluck contends that it fully cooperated in the companion countervailing duty investigation. Pl.'s Reply at 16. The court notes that although AFA was applied in the companion countervailing duty investigation, it was on the basis of the Government of India's and another respondent's failure to cooperate. See Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel From India: Final Affirmative Countervailing Duty Determination, 82 Fed. Reg. 58,172 (Dec. 11, 2017), and accompanying Issues and Decision Memorandum at 27 (noting that, regarding the application of an AFA rate to Goodluck, "[t]he CAFC has upheld the Department's application of AFA to a non-cooperating government even if it subjects a cooperating respondent to the 'collateral effects' of the adverse inference").

Commerce's decision: that, "[c]ontrary to Goodluck's claim that Commerce 'inexplicably' offset Goodluck's antidumping rate using the lowest export subsidy rate, the Department's normal practice is to offset an antidumping duty rate <u>based on AFA</u> with the lowest export subsidy rate in the companion countervailing proceeding."  Def.-Inters.' Br. at 34–35 (emphasis original).

Nowhere in the record does Commerce, itself, offer either explanation.  In the Final Determination, Commerce merely states that:

> Commerce normally adjusts cash deposits for estimated antidumping duties by the amount of export subsidies countervailed in a companion countervailing duty (CVD) proceeding, when CVD provisional measures are in effect.  Accordingly, where Commerce made an affirmative determination for countervailable export subsidies, Commerce has offset the estimated weighted- average dumping margin by the appropriate CVD rate.

<u>Final Determination</u>, 83 Fed. Reg. at 16,297.  In response to Goodluck's ministerial error allegations, Commerce reiterated this language and detailed that "Commerce deducted the lowest calculated export subsidy rate determined for any party in the companion CVD investigation from Goodluck's antidumping margin, which was based on total adverse facts available, (AFA), for antidumping cash deposit purposes, as intended." <u>U.S. Department of Commerce Ministerial Error Allegation Memorandum,</u> (May 16, 2018), P.R. 318.  This statement describes <u>what</u> Commerce did, but does not explain <u>why</u> Commerce used TPI's rate from the companion CVD investigation rather than the typical practice of using Goodluck's.  Thus, because Commerce has not provided a sufficient explanation on the record for departing from its usual practice of using the companion CVD rate in Goodluck's case, the court remands to Commerce to reconsider or to provide a more comprehensive explanation.

## CONCLUSION

In sum, the court finds that Goodluck's revised data submission should be categorized as a correctible importer mistake as opposed to untimely new factual information and remands to

Commerce for consideration of Goodluck's corrected submission.   Correspondingly, the court does not reach whether Commerce's reliance on facts otherwise available and adverse inferences is supported by substantial evidence and in accordance with law at this time.   The court further remands to Commerce to better explain or reconsider its approach to calculating the export subsidy cash deposit offset.   Commerce shall file with this court and provide to the parties its remand results within 120 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs addressing the revised final determination to the court and the parties shall have 15 days thereafter to file reply briefs with the court.

**SO ORDERED.**

/s/ *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: August 13, 2019
        New York, New York